**AM INTERNATIONAL, INC., Plaintiff–Appellee,**

v.

**INTERNATIONAL FORGING EQUIPMENT CORPORATION; Euclid Industries Center, Inc.; and Robert T. Dziak, Defendants/Third–Party Plaintiffs–Appellants,**

**Huff & Huff, Inc., Third–Party Defendant–Appellee.**

**No. 90–3958.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 10, 1991.

Decided Jan. 7, 1993.

---

Ronald S. Okada, Baker & Hostetler, Cleveland, OH, Michael Barry (argued), John W. Watson (briefed), Gardner, Carton & Douglas, Chicago, IL, for AM Intern. Corp.

Michael L. Hardy (argued), John J. Gruttadaurio, David E. Nash (briefed), Thompson, Hine & Flory, Cleveland, OH, for International Forging Equipment Corp.

Michael Barry (argued), John W. Watson, Gardner, Carton & Douglas, Chicago, IL, for Huff & Huff, Inc.

Before: RYAN and NORRIS, Circuit Judges; and DUGGAN, District Judge.*

ALAN E. NORRIS, Circuit Judge.

On June 22, 1988, AM International, Inc. (AMI), filed this action to recover costs incurred in removing environmentally hazardous substances from a site in Euclid, Ohio. AMI sought compensation pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.*, and pursuant to pendent state law causes of action for unjust enrichment and quasi-contractual damages. It named as defendants the owner of the site, Euclid Industrial Center, Inc. (EIC); the owner of certain equipment at the site, International Forging Equipment Corp. (IFE); the sole shareholder of EIC and principal of IFE, Robert

Dziak; and certain others no longer parties to this action. Defendants filed a number of counterclaims and brought a third-party action against the toxic substances disposal contractor hired by AMI to carry out the cleanup.

In a June 29, 1990 opinion published at 743 F.Supp. 525 (N.D.Ohio 1990), the district court ruled on summary judgment that AMI's state law claims were barred by a release it signed in 1984, but that the CERCLA claim was not barred. The district court also disposed of defendants' counterclaims. Their third-party negligence claim and AMI's CERCLA claim were heard in the course of a three-day bench trial, following which the district court determined, in an unpublished September 20, 1990 opinion, that defendants must compensate AMI for the entire cost of the cleanup pursuant to CERCLA, and that their negligence claim against the waste disposal contractor was without merit. Only the determination that defendants are liable to AMI under CERCLA has been appealed.

I.

Interaction between AMI and defendants EIC, IFE, and Dziak began in 1979, when D & B Realty, of which Dziak was a part owner,[1] entered into an agreement with AMI under which AMI leased back approximately 500,000 feet of a one million square foot building on property it agreed to sell to D & B Realty. The area AMI leased from D & B contained the equipment necessary for its manufacturing operations, which consisted of the manufacture of component parts for offset duplicating machines. The facility contained machining, painting, electroplating, and heat-treating production lines, and some of the equipment required for these processes were permanent fixtures. Pursuant to a novation in 1981, EIC assumed the obligations of D & B Realty under the sale-leaseback agreement.

---

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. D & B Realty and its other part owner were originally defendants in this action, but were dismissed and are not parties to the appeal.

Because it had become cheaper to purchase component parts manufactured elsewhere, AMI announced, in April 1982, that it would cease operations at the facility in October of that year when its lease was to expire. Dziak and AMI discussed the possibility of having EIC step in as operator of the manufacturing processes, but when this plan foundered, Dziak decided to have IFE purchase AMI's assets. IFE and AMI executed an asset sale agreement on October 18, 1982, under which IFE agreed to buy certain of AMI's assets, including the plating and painting operations, on an "as is, where is" basis. A number of contractual disputes subsequently arose between AMI and both IFE and EIC. In April 1984, in an effort to resolve these disputes, the parties entered into a separate agreement pursuant to which EIC paid AMI $2.3 million as accord and satisfaction, and AMI provided a release of all claims to EIC and Dziak.

All of AMI's production employees were terminated by mid-October 1982, although the plant engineer and a clean-up crew stayed on after the cessation of manufacturing operations to dispose of industrial wastes and generally clean up the facility. The clean-up crew's activities were finished in mid-November 1982. The electroplating baths, the salt pots for heat-treating, and the wastewater treatment plant were left by AMI with the appropriate substances and solutions in them, so that the lines were prepared for an immediate start-up of the facility by a new owner. These solutions were not subject to short-term decomposition.

In the months following the cessation of AMI's operations, Dziak conducted tours of the facility in search of a tenant interested in operating at the site, but after this effort failed, he sold off all of the portable components of the equipment purchased from AMI. The electroplating baths, salt pots, and wastewater treatment plant, which are fixtures, were not sold.

In late 1983, a water main break destroyed the building's sprinkler system and damaged the boiler. Neither the sprinkler nor the boiler was ever repaired, and heat was never restored to the facility. In 1984 or 1985, a section of the roof of the building collapsed and was not repaired; as a result, rain and snow fell into the facility, and each succeeding winter led to freezing and thawing.

In February 1986, following a citation from the local fire prevention bureau and an order from the local building commissioner that the facility be vacated, an official from the Ohio Environmental Protection Agency (OEPA) visited the facility and discovered drums and other containers filled with flammable or toxic substances scattered throughout the building, and a concentration of them in a chemical storage room. The official determined that the on-site chemicals were "hazardous waste" because they were not being cared for properly and created an environmental hazard due to the danger of fire or flooding at the facility. After several attempts to avoid meeting with OEPA, Dziak met with officials of that agency in March 1986. He was ordered to hire a hazardous waste removal contractor to prepare and carry out a remediation plan approved by OEPA. Dziak refused to comply and asserted that AMI was responsible for the hazardous substances at the facility. OEPA referred the matter of Dziak's refusal to the Ohio Attorney General's office, and contacted AMI. AMI agreed to perform the cleanup, and hired a contractor to draft a remedial action plan. The contractor's plan, drawn pursuant to OEPA's order that all chemicals and wastes be removed from the facility, was submitted in April 1986 and, after alterations, approved on May 23 of that year.

Following resistance from Dziak, the contractor gained access to the site in October 1986 and carried out the three-phase clean-up plan over the next year. Upon completion of the operation, OEPA toured the facility and approved the cleanup. AMI then made a demand upon EIC, IFE, and Dziak for reimbursement of the cost of the cleanup. When this was unsuccessful, AMI brought this lawsuit, pursuant to the

provisions of CERCLA[2] providing for recovery of response costs from responsible parties.

Following the bench trial, held to determine and apportion liability under CERCLA, the district court found that the paint and chemical compounds needed for the electroplating, heat-treating, and wastewater treatment operations were left by AMI "under appropriate conditions," and were left because both parties intended that Dziak or another lessee would use them to continue the operations at the facility. The district court also found that Dziak was aware of and responsible for the deteriorating condition of the facility housing these substances. It held that under the circumstances the chemicals could not be said to have created an environmental hazard until after defendants took over the facility from AMI, and therefore defendants were liable for the entire $310,450 in response costs incurred by AMI.

## II.

### A. Validity of AMI's Release as to Environmental Claims

Defendants first contend that the district court erred in ruling that the release executed pursuant to the April 1984 accord and satisfaction was not effective against the CERCLA cause of action. According to the release, AMI fully released and discharged defendants forever from

> any and all manner of actions, causes of action, defenses, counterclaims, suits, debts, accounts, covenants, controversies, agreements, warranties, promises, damages, judgments, executions, claims or demands whatsoever of every kind and description, known or unknown, in law or in equity, which AMI now has or may hereafter have against any of the [defendants] for, upon or by reason of any matter, cause or thing whatsoever
> . . . .

The district court examined the effect of the release in two separate contexts. It first confronted the question of whether any release could have the effect of barring AMI's CERCLA cause of action for contribution. It answered that question in the negative. That ruling, of course, did not preclude defendants from relying upon the release as a defense to AMI's state law causes of action. Accordingly, the district court then turned to the language of the release itself, and determined that it was effective to bar the state claims, since the court understood that the general rule under Ohio law is that anticipatory releases are valid.

Defendants contend on appeal that the release barred the CERCLA claim, as well as the state claims. AMI does not appeal the dismissal of its state claims. However, in addition to defending the district court's ruling on the ineffectiveness of a release to bar its CERCLA cause of action, AMI also argues that its judgment can be affirmed on an alternative ground should we reverse that ruling.[3] According to AMI, even if we were to decide that a properly drafted release could bar its CERCLA claim for contribution, when the release in question is viewed in the context of Ohio law it was not effective because it was not intended to encompass unforeseen environmental issues. AMI thus asserts from a defensive posture that the district court incorrectly concluded that the release was effective under Ohio law to bar unanticipated claims.

### 1. Validity of Release Under CERCLA

■ We first take up the ruling of the district court that parties responsible for environmental cleanups under CERCLA may not contractually transfer or allocate CERCLA liability among themselves. The district court's ruling has been the subject of comment and analysis by numerous authors[4] and has been followed by at least

---

**2.** 42 U.S.C. § 9607(a)(4)(B).

**3.** This court may, of course, affirm on grounds other than those of the district court. *Foster v. Kassulke*, 898 F.2d 1144, 1146 (6th Cir.1990).

**4.** *E.g.,* Thaddeus Bereday, Note, *Contractual Transfers of Liability under CERCLA Section 107(e)(1): For Enforcement of Private Risk Allocations in Real Property Transactions*, 43 Case W.Res.L.Rev. 161 (1992); Lynn E. Richter, Note, AM International v. International Forging

one other district court in our circuit. *See CPC Int'l, Inc. v. Aerojet–General Corp.,* 764 F.Supp. 479 (W.D.Mich.1991).

The district court examined section 107(e)(1) of the Act,[5] and pronounced the language quoted in the margin "internally inconsistent." It concluded that the first sentence "forbids giving effect to releases between tortfeasors in CERCLA contribution suits," and that the only effect of the second sentence is "to permit any person to contract with others not already liable under the act to provide additional liability by way of insurance or indemnity." 743 F.Supp. at 529–30. According to the district court, then, "defendants' reliance on the release given by AMI is misplaced." *Id.* at 530.

However, in a recent opinion released by another panel of this court, the district court's reading of the statute was rejected. In *Niecko v. Emro Marketing Co.,* 973 F.2d 1296 (6th Cir.1992), that panel, in construing a Michigan statute utilizing language essentially identical to the portion of CERCLA under consideration, did not read the two sentences as being inconsistent:

> [T]he better interpretation ... is that the first sentence provides that all parties involved are to be jointly and severally liable to the claimant under the statute. Where the claimant is the government, liability may not be transferred. However, as between the parties allegedly responsible ... liability may indeed be transferred. In other words, the first sentence ensures the clean up is performed and those responsible cannot escape their liability for cleaning the property. However, in terms of *financial* liability, the parties may allocate the costs of the clean up between them. Such an interpretation is consistent with

the legislative history of CERCLA, *See* 126 Cong.Rec. 30,984 (1980). This is a more palatable and consistent interpretation ... because it allows the two sentences to be read as internally consistent. The Ninth Circuit came to a similar holding in *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1460 (9th Cir.1986). We, therefor [sic], join with the Ninth Circuit in its interpretation of these clauses under CERCLA....

*Niecko,* 973 F.2d at 1300–01 (emphasis in original).

That reading of the two sentences of the statutory language seems to us to make sense both in logic and as a matter of public policy. The underlying purpose of the statutory language under scrutiny is to ensure that responsible parties will pay for the cleanup and that they may not avoid liability to the government by transferring this liability to another. However, this purpose is not inconsistent with parties responsible for the cleanup transferring or allocating among themselves the cost associated with this liability, so long as they remain liable to the third party who can demand the cleanup. This is what is permitted by the second sentence—the shifting or allocation of the risk of the cost of liability between potentially responsible persons, without diluting CERCLA liability for the cleanup itself. Such allocations may then be relied upon to govern the outcome of a later suit for contribution by the responsible party who actually was held responsible for the cleanup. As one commentator has noted:

> Section 107(e)(1) prohibits attempts to undermine CERCLA by transferring the liability owed to the CERCLA claimant. By the first sentence of the section, responsible parties are held accountable for

Equipment: *Does CERCLA Allow Private Parties to Contractually Allocate Liability for Cleaning Up Contaminated Sites?,* 22 U.Tol.L.Rev. 1065 (1991); Larry M. Sargent, Case Comment, *Environmental Law—AM International, Inc. v. International Forging Equipment: Release Agreements Between Private Parties Under CERCLA,* 21 Mem.St.U.L.Rev. 423 (1991).

**5.** 42 U.S.C. § 9607(e)(1), which provides:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

their actions and prohibited from escaping CERCLA liability. However, the second sentence provides an exemption which narrows the scope of the first sentence. This sentence exempts agreements to allocate the costs of liability between private responsible parties. These private risk allocations are permitted because they are consistent with the intent of the first sentence to prevent responsible parties from escaping CERCLA liability....

....

... [P]rivate risk allocations substantially assist in facilitating real estate transactions. Risk shifting provides a mechanism for the parties to minimize exposure to the risk of third-party CERCLA claims. While also protecting against third-party claims, risk shielding primarily represents a means to protect against the risk of claims by the other party to the transaction. These techniques provide flexibility in the negotiating process and facilitate the parties' ability to close real estate transactions successfully. Because of these benefits, private risk allocations may further CERCLA's ultimate goal of cleaning up pollution caused by hazardous substances.

Thaddeus Bereday, Note, *Contractual Transfers of Liability under CERCLA Section 107(e)(1): For Enforcement of Private Risk Allocations in Real Property Transactions*, 43 Case W.Res.L.Rev. 161, 204, 212 (1992) (citations omitted).

In view of the previous holding of this court in *Niecko*, the ruling of the district court that a release could not be effective to bar AMI's CERCLA cause of action for contribution, must be reversed.

### 2. Effect of the Release

Having determined that a release can be effective to allocate among responsible parties the financial burden of CERCLA clean-up liability, we now turn to the specific language of the release at issue in this appeal, to determine whether it operates to allocate the cost among these parties. The district judge, applying Ohio law, concluded that the release was effective to bar AMI's state cause of action. If the district court correctly comprehended Ohio law, then we will need to reverse the judgment awarded AMI on its CERCLA cause of action, since Ohio law controls our inquiry concerning the effectiveness of this particular release.[6] *See Mardan*, 804 F.2d at 1460. However, we are unable to agree with the district court's holding, since we conclude that Ohio's view of the law of mutual mistake in the context of releases of this nature may prevent our giving effect to the release to the extent that it would bar unanticipated environmental claims. Consequently, while we disagree with the basis of the district court's holding that the release is valid under Ohio law, the result of our conclusion that it may be invalid under Ohio law ultimately could be the affirmance of the court's holding that the release cannot be given effect to bar AMI's CERCLA claims for reimbursement for the money it expended to clean up defendants' facility.

In disposing of AMI's state claims, the district court cited *American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66, 68 (S.D.Ohio 1980), for the proposition that anticipatory releases are valid under Ohio law.[7]

While we do not disagree with the district court's statement of the general rule of Ohio law concerning the effect of anticipatory releases, we cannot agree that it necessarily follows that the release in question was effective under the circumstances of this case. That is because Ohio courts have carved out an important exception to

---

6. The parties do not dispute the district court's determination that, where the contract is governed by state law, Ohio law controls the efficacy of the release. *See American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66, 68 (S.D.Ohio 1980) ("In Ohio, the validity of a release is to be determined by the law of the place where it was made and is to be performed....").

7. That court stated: "[A]nticipatory releases are neither unusual nor per se void as a matter of public policy.... In Ohio, an anticipatory release appears to be a valid contract." 505 F.Supp. at 68 (citations omitted).

the general rule. In *Sloan v. Standard Oil Co.*, 177 Ohio St. 149, 203 N.E.2d 237 (1964), the Ohio Supreme Court held that verbatim terms of a general release are not controlling under circumstances where the parties to a release did not actually intend to discharge all liability. The court set out the Ohio rule for avoiding releases in the syllabus to that opinion:

1. A release may be avoided where the releasor can establish by clear and convincing evidence that it was executed by mutual mistake, as between himself and the release, of a past or present fact material to the release, as where there was a mutual mistake as to the existence of any injury of the releasor, unless it appears further that the parties *intended* that claims for all injuries, whether known or unknown at the time of the execution of the release, be relinquished.

2. Whether the parties to a release actually intended to discharge all liability is a question of fact for the trier of the facts.

3. The terms of a release cannot circumvent the powers of equity to correct mistakes.

*Id.* at 149, 203 N.E.2d at 238 (citation omitted). The court went on to point out that "[t]he dispositive inquiry in each case is what did the parties intend? ... Because intent is a question of fact, it is necessary in each case to examine all the circumstances surrounding the execution of the release." *Id.* at 152–53, 203 N.E.2d at 240.

The Ohio Supreme Court set out factors to be considered in determining the intent of the parties:

Certain factors have been judicially recognized as aids whereby the intent of the parties at the time the release was executed may be determined. Stated favorably to the party seeking rescission or cancellation, these factors are: The absence of bargaining and negotiating leading to settlement; the releasee is clearly liable; absence of discussion concerning [the type of injuries suffered]; the contention that the injuries were in fact unknown at the time the release was executed is reasonable; an inadequate

amount of consideration received compared with the risk of the existence of unknown injuries; haste by the releasee in securing the release; and the terms of the release exclude the injuries alleged.

*Id.* at 153, 203 N.E.2d at 240 (citations omitted). In *Sloan,* the plaintiff was in a car accident and had experienced only headaches and a stiff neck prior to signing a release and receiving a check for the cost of repairing his car; twelve months after the accident, the plaintiff underwent an operation for a ruptured cervical disc that was found to have resulted from the automobile accident. The court held that because the settlement represented the cost of the plaintiff's car repairs and neither party realized or discussed the possibility that the plaintiff had sustained a severe personal injury at the time the release was signed, the release did not bar plaintiff's claim for the personal injury despite contract language indicating that the plaintiff discharged and released the defendant from "all liability, claims, demands, controversies, damages, actions, and cause of action whatsoever, either in law or equity, which the undersigned ... have or may have, now or hereafter by reason of or in any wise incident to or resulting from the accident hereinbefore mentioned." *Id.* at 150, 203 N.E.2d at 238–38.

In a factually similar case, the Ohio Court of Appeals in *Woyma v. Ciolek,* 11 Ohio App.3d 288, 465 N.E.2d 486 (1983), reached the same conclusion, upholding a $22,500 jury award to compensate the plaintiff for a latent injury that resulted in severe neck, arm, and shoulder pain, dizzy spells, and the inability to stand up straight, but which was undiagnosed and unknown at the time the plaintiff signed a release and received $15 to compensate her for three days of headaches and neck pain. The release in that case stated that it was to "terminate all claims for both known and unknown injuries and damages [of] whatever nature, including all future developments thereof, in any way growing out of or connected with or which may hereafter in any [way] grow out of or be connected with said accident...." *Id.* at 290, 465 N.E.2d at 488. In applying the factors set

out in *Sloan*, that court emphasized that the negotiations "centered on" subjects other than the plaintiff's personal injuries, and "did not appear to involve any attempts to bargain or negotiate a sum for the relinquishment of all future physical injury claims. Instead, [plaintiff and defendant's insurance company] only discussed the medical bills already incurred." *Id.*

■ These opinions demonstrate that under Ohio case law, even where a release contains unambiguous language that purports to bar claims based on unknown future causes, the release will not be effective where evidence clearly indicates that, at the time they signed the release, the parties had neither foreseen nor considered the specific cause which later gave rise to the claim.

■ The record before us supports the district court's determination that the source of the environmental hazard was the dilapidated state of the facility's roof and the absence of a sprinkler system. These conditions largely came about near or after the time of the release and, in any case, came well after the possession and ownership of the facility and all the equipment were fully transferred to defendants. The OEPA's intervention did not begin until nearly two years after the release was signed. However, upon the state of the record, we are unable to say whether, at the time the release was executed, the parties contemplated environmental claims or circumstances that would give rise to such claims. The fact that the events causing the harm upon which liability is predicated had not occurred at the time of the signing of a release is strong evidence that the parties did not intend the release to bar such liability. *See Swenson v. Ewy*, 54 Ohio St.2d 470, 475, 377 N.E.2d 519, 523 (1978).

Accordingly, we must remand this cause to the district court in order that a record may be developed that will permit the court to address the criteria set out by the Ohio Supreme Court in *Sloan* and to determine whether the evidence clearly and convincingly establishes that the parties did not intend the release to cover liability for environmental damage in general or the CERCLA cleanup costs in particular.

**B. Apportionment of CERCLA Liability**

Defendants next contend that even if the release did not bar AMI's CERCLA action, AMI is nonetheless liable for some or all of the clean-up costs under the terms of the Act. Section 107(a) provides that "necessary costs of response incurred by any other person consistent with the national contingency plan" in cleaning up a facility "from which there is a release, or a threatened release ... of a hazardous substance" may be recovered by such other person from liable parties, as defined in that section of the Act. 42 U.S.C. § 9607(a)(4)(B) and (a)(4). Section 113(f) of CERCLA provides for contribution among parties deemed liable under section 107(a), with response costs to be allocated among such parties "using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). Section 107(a) defines the following as liable parties: (1) owners and operators of a facility at the time of its cleanup; (2) owners and operators of the facility at the time of disposal; (3) generators of waste who arranged for disposal; and (4) transporters who selected the site for disposal. 42 U.S.C. § 9607(a)(1)–(4).

In its unpublished September 20, 1990 Memorandum Opinion and Order following the trial, the district court ruled that AMI was entitled to recover the entire amount of the clean-up costs because it was not a liable party under any of these four categories, whereas defendants were liable under the first two, as present owners of the facility and owners at the time of waste disposal.

Defendants do not dispute the finding that they are liable parties, but argue that AMI is liable as well, under the third category: "[A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ... at any facility...." 42 U.S.C. § 9607(a)(3). De-

fendants assert that AMI owned the chemicals creating the hazard because the written asset sale contract between IFE and AMI does not list these substances among the assets sold to IFE. Defendants argue that the only evidence supporting a finding that ownership was transferred is parol evidence, which may not be used to contradict or add terms to an unambiguous written contract. They therefore contend that AMI abandoned these chemicals when it left the Babbit Road facility in 1982. Defendants cite case law from another jurisdiction for the proposition that the owner of hazardous substances remains liable, under federal statutory environmental schemes, for damage caused by hazardous substances it abandons.[8] Accordingly, under Ohio law, the release was not valid to bar AMI's CERCLA claim against defendants. *See Moreco Energy, Inc. v. Penberthy–Houdaille,* 682 F.Supp. 933 (N.D.Ill. 1988) (addressing liability for disposal of PCB's under the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*). Defendants next argue that if AMI is nonetheless held to have transferred ownership of the chemicals to IFE as part of the asset sale agreed upon in October 1982, AMI is still liable under section 107(a)(3) because such a transfer constitutes an arrangement for disposal. As both of defendants' arguments are unpersuasive, we affirm the district court's determination that AMI did not arrange for disposal of hazardous substances for the purposes of establishing liability under section 107(a).

■ Even if AMI owned the chemicals at issue, it did not incur liability under section 107(a)(3), because it did not "arrange for their disposal." "Disposal" under section 101(29), 42 U.S.C. § 9601(29), is deemed to take place only at the point at which there is a threat that hazardous wastes will be emitted into the environment, air, soil, or groundwater.[9] The district court determined that in this case the threat only arose after defendants purchased the entire facility and allowed the building and its sprinkler system to deteriorate. The deterioration of the roof was found to have given rise to flooding that endangered the groundwater, and the broken sprinkler was found to give rise to the threat of fire that would endanger the air. The district court concluded that events at the facility after AMI left it were entirely responsible for the "disposal" of the wastes. In addition, defendants' contention that the chemicals were abandoned was essentially refuted by the district court, which found that these substances were

> left by AMI in 1982, under appropriate conditions, because AMI believed that Dziak wanted them. Dziak stated in the supply contract negotiations that he wished the substances used in the processes to be left so that he would have a complete ongoing process. He did not indicate to the contrary during the asset sale negotiations and, until OEPA appeared, acted not only with knowledge of the chemicals, but as if they were his.

District Court's September 20, 1990 Memorandum Opinion and Order at 11. The factual determinations of a district judge sitting without a jury are reviewed only for clear error, Fed.R.Civ.P. 52(a); *Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 440 (6th Cir.1991), and nothing in the record indicates that the district court's findings were clearly erroneous.

■ Alternatively, if ownership of the substances was transferred to defendants, AMI still cannot be deemed to have arranged for the disposal of hazardous substances.[10] The rule relied upon by defen-

---

**8.** They also assert that this proposition is established by the fact that CERCLA's definition of "release" includes "abandonment." *See* 42 U.S.C. § 9601(22).

**9.** "Disposal" is defined under section 101(29) of CERCLA, 42 U.S.C. § 9601(29), by reference to the Solid Waste Disposal Act, 42 U.S.C. § 6903, which defines disposal as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into

or on any land ... so that [it] may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

**10.** It should be noted that, contrary to defendants' assertion, the district court did not determine that ownership of the chemicals was transferred. It merely determined that defendants were aware that the paint and chemical com-

dants does not apply to this case. Defendants cite *New York v. General Electric Co.*, 592 F.Supp. 291 (N.D.N.Y.1984), in which the court refused to dismiss the plaintiff's CERCLA claim on a Fed.R.Civ.P. 12(b)(6) motion, because the plaintiff alleged that the defendant sold used transformer oil to a raceway in order to dispose of it. The court pointed out that for purposes of the motion it had to accept the allegation that the defendant acted with the knowledge that the substances would be deposited on the land surrounding the raceway's drag strip, and held that "a waste generator's liability under CERCLA is not to be so facilely circumvented by its characterization of its arrangements as 'sales.'" *Id.* at 297.

However, courts interpreting section 107(a)(3) have consistently held that the mere sale of a product is not "arranging for disposal" under the statute. *See Kelley v. ARCO Indus. Corp.*, 739 F.Supp. 354, 357–58 (W.D.Mich.1990), and cases cited therein. In *Kelley*, the court pointed out that "the *General Electric* case 'in no way stated or implied that liability attaches to all transactions in a hazardous substance.'" *Id.* at 360 (*quoting Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651 (N.D.Ill.), *aff'd*, 861 F.2d 155 (7th Cir.1988)). Liability only attaches to parties that have "taken an affirmative act to dispose of a hazardous substance ... as opposed to convey a useful substance for a useful purpose." *Prudential Ins. Co. v. United States Gypsum*, 711 F.Supp. 1244, 1253 (D.N.J.1989). Thus, it has been held that no arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a "useful, albeit dangerous product, to serve a particular, intended purpose." *Id.* at 1255, *quoted in Kelley*, 739 F.Supp. at 358; *cf. United States v. A & F Materials Co.*, 582 F.Supp. 842 (S.D.Ill.1984) (holding that the seller of a caustic solution could be a responsible party under CERCLA if the

motivation for the sale was the disposal of the solution).

In this case, the district court determined that the chemicals were not left at the facility with disposal in mind: "Both Dziak and AMI intended that the chemicals would be used for the purposes for which they had been bought—the continued operation of the electroplating, heat-treating, and other processes." District Court's September 20, 1990 Memorandum Opinion and Order at 21. Furthermore, the district court specifically found that the chemicals "were useful and had value," and that "[m]any of the compounds were valuable even four years later." *Id.* at 11. As these determinations are well supported by the record, we cannot hold that they are clearly erroneous. Therefore, even if ownership of the chemicals was transferred by AMI as part of the asset sale, such a transfer was not an arrangement to dispose of hazardous substances under section 107(a)(3).

Because we conclude that the district court properly determined that AMI was not a liable party under section 107(a), we need not address defendants' claim concerning the appropriate apportionment of liability under section 113(f).

### III.

The judgment of the district court is affirmed in part and reversed in part, and this cause is remanded to the district court for further proceedings according to law and consistent with this opinion.

---

pounds used for the electroplating, heat-treating and wastewater treatment operations were left by AMI in 1982, and that they were left there because AMI appropriately believed that defendants wanted them. The district court did not need to address the issue of whether ownership

of the chemicals was transferred in determining liability under the first two categories of section 107(a), because such liability is predicated on ownership of the "facility" from which hazardous substances are released, not on ownership of the chemicals.