100 F.3d 1227
 United States of America (94-1568), Frank J. Kelley, Attorney General of the State of Michigan, and the State of Michigan (94-1419), Plaintiffs-Appellants,
v.
Cello-Foil Products, Inc., Clark Equipment Company, General Foods Corporation, and Hoover Universal, Inc., Defendants-Appellees.
 Nos. 94-1419, 94-1568
 United States Court of Appeals,
Sixth Circuit
 Argued May 19, 1995
Decided November 22, 1996
 
 On Appeal from the United States District Court for the Western District of Michigan David C. Shilton (argued and briefed), U.S. Department of Justice, Land & Natural Resources Division, Washington, DC, Robert P. Reichel, Asst. Attorney Gen., Lansing, MI, for U.S. in No. 94-1419.
 John R. LaParl, Jr., Smith, LaParl & Mequio, Portage, MI, for Cello-Foil Products, Inc.
 Thomas W. Daggett, Cynthia A. King, Wildman, Harrold, Allen & Dixon, Chicago, IL, Larry C. Willey, Grand Rapids, MI, for Clark Equipment Company.
 John C. Martin (argued and briefed), Suzanne R. Schaeffer, Patton Boggs & Blow, Washington, DC, Larry C. Willey, Grand Rapids, MI, for General Foods Corp. in No. 94-1419.
 Larry C. Willey, Grand Rapids, MI, Timothy C. Russell (argued and briefed), Pamela A. Welty, Stuart E. Hunt, Sonnenschein, Nath & Rosenthal, Washington, DC, for Hoover Universal, Inc. in No. 94-1419.
 David C. Shilton (argued and briefed), U.S. Department of Justice, :and & Natural Resources Division, Washington, DC, Robert P. Reichel, Asst. Attorney Gen., Lansing, MI, Leslie E. Lehnert, Unites States Department of Justice, Environmental Enforcement Section, Washington, DC, for U.S. in No. 94-1568.
 John C. Martin (argued and briefed), Suzanne R. Schaeffer, Patton, Boggs & Blow, Washington, DC, for General Foods Corp. in No. 94-1568.
 Timothy C. Russell (argued and briefed), Pamela A. Welty, Stuart E. Hunt, Sonnenchein, Nath & Rosenthal, Washington, DC, for Hoover Universal, Inc. in No. 94-1568.
 Before: JONES and NORRIS, Circuit Judges; DOWD, District Judge.*
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Plaintiffs, the United States, the Michigan Attorney General and the State of Michigan, appeal the district court's grant of summary judgment to Defendants Cello-Foil Products, Inc., Clark Equipment Company, General Foods Corporation, and Hoover Universal, Inc., in this action for environmental response costs brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). We conclude the district court erred in its application of the arranger liability portion of CERCLA and genuine issues of material fact exist that preclude summary judgment. Therefore, we reverse and remand this case for further proceedings.
 
 I.
 
 2
 This case involves a major hazardous waste cleanup involving the Verona Well Field, which is the primary public water supply to over 35,000 residents of Battle Creek, Michigan. See Kelley v. Thomas Solvent Co., 727 F. Supp. 1532, 1535 (W.D. Mich. 1989). In 1981, Michigan authorities determined volatile organic chemicals were contaminating the well field. With the assistance of the United States Environmental Protection Agency, the State determined that two of Thomas Solvent Company's ("Thomas Solvent") facilities, known as the Raymond Road Facility and the Annex, were two of the sources of the contamination.
 
 
 3
 Thomas Solvent, a producer and seller of solvents, operated in Battle Creek from the time of its incorporation in 1963 until 1984, the year it filed for voluntary bankruptcy. During these years, Thomas Solvent sold virgin solvents to numerous customers, including Defendants. Thomas Solvent usually delivered the solvents in fifty-five gallon drums.
 
 
 4
 Thomas Solvent used the Raymond Road Facility for the storage, transfer, and packaging of solvents and for the cleaning of tanker trucks. Through a drum-deposit arrangement, Thomas Solvent shipped the solvents in its re-usable drums and charged its customers a deposit. Most often, the Thomas Solvent delivery person retrieved the used drums when delivering new, full drums. The returned drums were usually taken to the Raymond Road Facility. The customers were credited for the amount of the drum deposit, when they returned the old drums to Thomas Solvent.
 
 
 5
 The contents of the returned drums varied. Some of the drums' contents had been emptied as much as possible, some had been refilled with water, and some contained unused solvents of up to fifteen gallons. Thomas Solvent employees inspected the drums when the drums reached either the Raymond Road Facility or the Annex. Drums in need of reconditioning were sent to a reconditioner, often without being rinsed or cleaned. Drums not in need of reconditioning were emptied of any remaining contents, often, onto the ground. The emptied drums were either immediately refilled with solvent or cleaned with a rinseate solution. Prior to 1978, the used rinseate was usually dumped onto the ground. In later years, Thomas Solvent began to recycle the rinseate at off-site locations.
 
 
 6
 In 1992, the United States and the State each filed complaints against Defendants. The Defendants are four longstanding customers of Thomas Solvent, which returned drums to Thomas Solvent during the period when Thomas Solvent employees were rinsing drums and disposing of the rinseate on the ground. The complaints, brought pursuant to CERCLA 107, 42 U.S.C. Section(s) 9607, collectively sought over $5 million in past response costs for cleanup activities at the Raymond Road Facility plus a declaratory judgment for future response costs. Plaintiffs alleged that Defendants had arranged for disposal of hazardous substances when they returned the drums to Thomas Solvent. The two actions were consolidated for discovery and pretrial purposes.
 
 
 7
 The magistrate judge decided that this case presented exclusively questions of law and stayed discovery so the parties could file motions for summary judgment. Pursuant to the direction of the magistrate judge, the Defendants filed motions for summary judgment. The Defendants argued that their contract agreement with Thomas Solvent did not impliedly suggest an arrangement for disposal of residual amounts remaining in the drums. Defendants Cello-Foil and Hoover filed a supplemental motion for summary judgment on the ground that the Plaintiffs had failed to offer proof that a disposal ever occurred of solvent residues returned from Cello-Foil or Hoover. After oral argument, the district court granted Defendants' motions for summary judgment on the issue of arranger liability. The court then dismissed, as moot, the joint motion for summary judgment filed by Cello-Foil and Hoover. The Plaintiffs filed this timely appeal.
 
 II.
 
 8
 In this case we are called upon to interpret the scope of CERCLA arranger liability. The relevant provision of CERCLA states that:
 
 
 9
 Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
 
 
 10
 * * * *
 
 
 11
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, . . . shall be liable . . . .
 
 
 12
 42 U.S.C. Section(s) 9607(a). The Plaintiffs do not contend that the Defendants arranged for disposal by contract or agreement; rather, they assert that the Defendants "otherwise arranged for disposal" of their unused hazardous solvents through the drum-deposit arrangement. The Plaintiffs claim that the Defendants entered into an arrangement, whereby Thomas Solvent would pick up the residue-containing drums, take them to its Raymond Road Facility, dispose of the residue, and then credit the Defendants with their drum deposit. The district court found that the Defendants could not be held liable because they lacked "intent" to dispose of the residual hazardous substances.
 
 
 13
 CERCLA does not define the phrase "arrange for." Amcast Indus. Corp. v. Detrex Corp., 2 F.3d 746, 751 (7th Cir. 1993). We conclude that the requisite inquiry is whether the party intended to enter into a transaction that included an "arrangement for" the disposal of hazardous substances. The intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances.
 
 
 14
 At first blush, discussing state of mind in a CERCLA case appears inappropriate. After all, if the tortured history of CERCLA litigation has taught us one lesson, it is that CERCLA is a strict liability statute. See generally United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507 (6th Cir. 1989), cert. denied, 494 U.S. 1057 (1990); J.V. Peters & Co. v. Administrator, EPA, 767 F.2d 263, 266 (6th Cir. 1985). Notwithstanding the strict liability nature of CERCLA, it would be error for us not to recognize the indispensable role that state of mind must play in determining whether a party has "otherwise arranged for disposal . . . of hazardous substances." 42 U.S.C. Section(s) 9607(a).
 
 
 15
 We derive the intent element from the canons of statutory construction. "Otherwise arranged" is a general term following in a series two specific terms and embraces the concepts similar to those of "contract" and "agreement." 2A Norman J. Singer, Sutherland Statutory Construction Section(s) 47.17 (1992); Woods v. Simpson, 46 F.3d 21, 23 (6th Cir. 1995). All of these terms indicate that the court must inquire into what transpired between the parties and what the parties had in mind with regard to disposition of the hazardous substance. Therefore, including an intent requirement into the "otherwise arranged" concept logically follows the structure of the arranger liability provision.
 
 
 16
 The theory that intent is relevant in this context is no stranger to us. The district court correctly noted that this circuit has read an intent or state of mind requirement into the "otherwise arranged for disposal" concept. In AM Int'l, Inc. v. International Forging Equip. Corp., 982 F.2d 989 (6th Cir. 1993), this circuit was called upon to decide the applicability of arranger liability to AM International (AMI), which entered into an agreement to sell a manufacturing facility to a realty company. The facility contained several types of machinery and fixtures necessary for the manufacture of component parts for offset duplicating machines. After ceasing their manufacturing process, AMI cleaned up the facility and cleared it of industrial wastes. Nevertheless, because the facility was sold on an "as is, where is" basis, certain manufacturing features, including electroplating baths, salt pots for heat-treating, and the waste water treatment plant, were left by AMI containing the appropriate solutions, so that the lines would be prepared for an immediate start-up of the facility by a new owner.
 
 
 17
 Following a long line of cases distinguishing the sale of a useful asset from an arrangement for disposal, the court held that AMI had not arranged for disposal of the hazardous substances that it left in the building. Id. at 999. The court stated: "Liability only attaches to parties that have `taken an affirmative act to dispose of a hazardous substance . . . as opposed to convey a useful substance for a useful purpose.'" Id. (quoting Prudential Ins. Co. v. United States Gypsum, 711 F. Supp. 1244, 1253 (D.N.J. 1989)). Therefore, in the absence of a contract or agreement, a court must look to the totality of the circumstances, including any "affirmative acts to dispose," to determine whether the Defendants intended to enter into an arrangement for disposal.[1] We believe that this principle is in line with the Seventh Circuit's "intentional action" requirement for arranger liability announced in Amcast Indus. Corp. v. Detrex Corp., wherein the court concluded that the term "arranged for" "impl[ies] intentional action." 2 F.3d 756, 751 (7th Cir. 1993), cert. denied, 114 S. Ct. 691 (1994).
 
 
 18
 As mentioned above, examining state of mind or ascertaining intent at the contract, agreement, or other type of arrangement stage does not undermine the strict liability nature of CERCLA. The intent inquiry is geared only towards determining whether the party in question is a potentially liable party. Once a party is determined to have the requisite intent to be an arranger, then strict liability takes effect. If an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for "arranging for" disposal, even when it has no control over the process leading to the release of substances. Cadillac Fairview/California Inc. v. United States, 41 F.3d 562, 565 (9th Cir. 1994) (citations omitted). Therefore, once it has been demonstrated that a party possessed the requisite intent to be an arranger, the party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site.
 
 III.
 
 19
 In reviewing this summary judgment, we must determine whether the district court overlooked any genuine and material issues concerning the Defendants intent to arrange or not to arrange for the disposal of any solvents returned with the drums. The district court "[found] compelling Defendants' argument that, because they lacked intent to dispose of hazardous substances, they may not be held liable as arrangers." Employing the dictionary definition of "arrange" the district court concluded that, in order to arrange, the parties must "make preparations" or "plan." See J.A. at 127 (Memorandum Opinion at 8). The district court also relied heavily on the Seventh Circuit's decision in Amcast Indus. Corp. v. Detrex Corp., in which the court concluded that the term "arranged for" "impl[ies] intentional action." 2 F.3d at 751. The district court ultimately concluded that "[w]hatever else `otherwise arranged for disposal means' . . . it does not apply to situations where there was no intent to dispose of a hazardous substance." J.A. at 127 (Memorandum Opinion at 8).
 
 
 20
 Although the district court correctly incorporated a state of mind requirement into the otherwise arranged for disposal concept, the court erred by applying the standard to the facts of this case. The following language from the district court's opinion illustrates the court's error:
 
 
 21
 [T]he court concludes, therefore, that Defendants are not liable under section 107(a)(3) absent a showing that they intended to dispose of the residual amounts of the hazardous substances remaining in their returned drums. It is immediately clear that the Government's claim against Defendants fails to establish liability. The purpose of Defendants' returning of the drums was to recover the deposits that Defendants had paid; the Government has absolutely no proof that Defendants' purpose was to dispose of residual amounts of hazardous substances remaining in those drums. That Defendants incidentally got rid of these residues does not mean that it was Defendants' purposeful intent to dispose of the residues; rather, this was merely incidental to the drum return.
 
 
 22
 J.A. at 128 (Memorandum Opinion at 9) (second emphasis added). The primary purpose of the drum return arrangement was to regain the deposit; however, we conclude the district court erred when it concluded the Government offered absolutely no proof that Defendants' further purpose was to dispose of the residual wastes returned with the drums.
 
 
 23
 The district court employed an overly restrictive view on what is necessary to prove intent, state of mind, or purpose, by assuming that intent could not be inferred from the indirect action of the parties. In doing so, the district court overlooked genuine issues of material fact. "Frequently, the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds." Washington v. Davis, 426 U.S. 229, 253 (Stevens, J. concurring); see also United States v. Kirk, 584 F.2d 773, 777 (6th Cir. 1978) ("[K]nowledge, like intent, is a factual issue which may be proved by circumstantial evidence."), cert. denied, 440 U.S. 931 (1979).
 
 
 24
 Whether a party possesses the requisite intent is a question of fact. Lord Justice Bowen noted:
 
 
 25
 The state of man's mind is as much a fact as the state of his digestion. It is true that is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else.
 
 
 26
 Eddington v. Fitzmaurice, 29 Ch. Div. 459, 483 (1885).
 
 
 27
 In this case, summary judgment would have been appropriate only if no genuine issues regarding intent existed. Our review of the record, however, reveals genuine issues of material fact regarding whether the parties returned solvents to Thomas Solvent with the additional purpose of disposal of unused solvents. The volumes of deposition testimony create scenarios, some conflicting, from which a trier of fact could conclude that Defendants, without a contract or agreement, otherwise arranged for disposal of their hazardous substances by Thomas Solvent. Such a finding would preclude the district court's conclusion that any disposal was incidental to the primary drum return transaction. For example, deposition testimony elicited from employees of Thomas Solvent and Defendants creates an issue as to whether the Defendants ever took "affirmative acts to dispose" of unused solvent, as required by AM Int'l, 982 F.2d at 999. By leaving amounts of solvents in drums ranging from one-half to ten gallons, which Defendants knew Thomas Solvent would carry away, a trier of fact could infer that Defendants were taking affirmative acts to dispose.[2] By the same token, the finder of fact could conclude that Defendants did not leave solvents in the drums[3] or that their acts in leaving residual amounts of solvents in the drums does not support an inference of purposeful or intentional disposal,[4] or find that the drums were filled with waste water and other debris.[5] A finder of fact must resolve this issue, and thus, the district court acted too hastily in finding no showing of intent. The district court overlooked genuine issues of material fact that make the resolution of this issue inappropriate at the summary judgment stage. As the Fourth Circuit has noted, issues regarding parties' intent, with respect to agreements or contracts, "present interpretive issues traditionally understood to be for the trier of fact." Charbonnages, 597 F.2d at 415. We hold the same should apply to issues of intent concerning "otherwise arranged" liability under CERCLA.[6]
 
 IV.
 
 28
 Accordingly, this case will be remanded for proceedings consistent with this opinion. Further in light of this ruling, the district court shall reinstate Hoover and Cello-Foil's supplemental motion for summary judgment on the issue of whether disposal of its hazardous substances took place. Because we have concluded that the existence of genuine issues of material fact preclude the entry of summary judgment on the issue of arrangement for disposal, the motion for summary judgment regarding whether "a disposal" of waste belonging either to Hoover or Cello-Foil must be decided upon the merits.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 In making our decision today, we rely on this portion of the holding from AM Int'l, but must carefully explain our reasoning. Despite the urging of the Defendants in this case, we do not construe the return of the drums pursuant to the drum deposit arrangement as the sale of a useful hazardous substance for its original intended purpose. We wish to make clear that we do not rely on AM Int'l on the basis of such a comparison. As much as the Defendants would like, we will not view these transactions as matters involving only the drums with no regard to the contents. For this case is not about the disposal of the drums, it is about the disposal of their contents at Thomas Solvent's Raymond Road Facility
 In concluding that the transaction in AM Int'l was not a disposal, this court relied on two findings of the district court. First, the court relied on the finding that "`both [the buyer] and AMI intended that the chemicals would be used for the purposes for which they had been bought--the continued operation of the electroplating, heat-treating, and other processes.'" AM Int'l, 982 F.2d at 999 (citation omitted). Second, the court found that "the chemicals `were useful and had value.'" Id. In sum, the district court determined that "the chemicals were not left at the facility with disposal in mind." Id.
 
 
 [2]
 E.g., J.A. at 1226 (Thomas Solvent employee Richard Gunyan testifying that "it is impossible really to drain a drum completely dry. It [doesn't] work that way. You will get -- you will get some residue in there. About the best you can do, I would say you could probably get about everything out but maybe half a teacup."); J.A. at 1199 (Thomas Solvent employee Richard Clark testifying that Clark's drums were returned with "all kind of things" in them, that "once in a while" General Foods drums were brought back containing "some sort of residual liquid," and that, on average, if there was residue left in the drums, it would range anywhere from a one-half a teacup full to less than a half gallon); J.A. at 1225 (Thomas Solvent employee Richard Gunyan testifying that "on occasion" Clark returned drums containing residual solvent); J.A. at 1226 (Gunyan testifying that General Foods' returned drums contained a "little bit" of solvent in them.); J.A. at 1348 (Thomas Solvent employee Clarence Charkowski testifying that Thomas Solvent employees drained drums that were returned containing residual liquid); J.A. at 1357 (Thomas Solvent employee Terry Harrison testifying that after drums were returned to Thomas Solvent, the employees drained the remaining liquid, whether it was a "cup or a gallon or a half gallon or whatever."); J.A. at 1370 (Thomas Solvent employee Richard Clark testifying that the amount of residue in drums ranged from a teacup full to a half barrel, averaging one-half gallon)
 
 
 [3]
 E.g., J.A. at 465-66 (General Foods employees Billy Dean Jones testifying that drums were tipped until dry); J.A. at 484-85, 496-97 (General Foods employee Paul A. Petrow testifying that it was common practice to empty the drum rather than return valuable solvent and also that drums were tipped until dry); J.A. at 511 (General Foods employee Michael McGinnis testifying that to his knowledge, the drums were returned empty); J.A. at 526 (General Foods employee David L. Roe testifying that drums were drained for a few minutes, until empty); J.A. at 567 (Cello-Foil employee Robert Roy testifying that "[y]ou didn't like to leave solvent in the drums because it was costly and to utilize everything you get out of it."); J.A. at 1190 (Cello-Foil employee Tom G. Hall testifying that nothing was left in the drums after Cello-Foil employees completed the process of draining the drums)
 
 
 [4]
 E.g., J.A. at 530 (Hoover employee Ronald LeRoy McDiarmid testifying that after as much solvent as possible was pumped from the drums, the drums were tipped to get them "as empty as possible"); J.A. at 563 (Cello-Foil employee Gary Lee Henderson testifying that drums were tipped until they "got essentially everything out of it")
 
 
 [5]
 E.g., J.A. at 314 (Thomas Solvent employee Terry Harrison testifying that, if anything, water was usually left in drums returned from Defendant Clark)
 
 
 [6]
 One of the difficult issues this case presents is how much must be left in a returned drum before CERCLA liability attaches. As the evidence in this case indicates, typical commercially employed methods for emptying solvent barrels leaves some residue, approximately a tea cup's worth, in the barrel. If every party who left this amount of residue in a drum were liable, every drum return agreement or arrangement would be considered an arrangement for disposal. In light of the demonstrated physical problems in completely emptying these drums, we are not convinced that CERCLA is intended to reach all such transactions. Rather, whether a drum return arrangement is an arrangement for disposal should be determined on a case-by-case basis. Furthermore, there appear to be benefits of these agreements, such as the reuse and recycling of drums, which we do not wish our interpretation of the statute to discourage. Thus, at this point it is important to reiterate that whether an arrangement has been made is an issue to be determined viewing the totality of the circumstances