**UNITED STATES of America,**
**Plaintiff,**

v.

**The ATLAS LEDERER COMPANY,**
**et al., Defendants.**

No. C–3–91–309.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 16, 2000.

---

14. The Plaintiff has failed to file a Memorandum opposing Sandoz' Motion for Reconsideration.

Resources Division, Department of Justice, Washington, DC, David A. Carson, United States Department of Justice, Environment and Natural Resources Div., Environmental Defense Section, Washington, DC, Cecilia E. Kim, Environmental Defense Section, Environmental & Natural Resources Div., U.S. Department of Justice, Washington, DC, Gregory L. Sukys, U.S. Department of Justice, Environmental Enforcement, Washington, DC, Thomas Giller, U.S. Department of Justice, Chicago, IL, Sherry L. Estes, Assistant Regional Counsel, U.S. Environmental Protection Agency, Chicago, IL, Jacqueline Schuster Hobbs, Benesch Friedlander Coplan & Aronoff, Cincinnati, OH, for Plaintiff.

Michael A. Cyphert, Heather A. Austin, Louis L. McMahon, Cleveland, OH, for Defendants.

DECISION AND ENTRY OVERRULING MOTION FOR SUMMARY JUDGMENT (DOC. # 330) FILED BY DEFENDANT LIVINGSTON & CO., INC.; DECISION AND ENTRY OVERRULING CERTAIN PARTIES' ADOPTION OF MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT LIVINGSTON & CO., INC. (DOC. # 335)

RICE, Chief Judge.

This matter comes before the Court upon: (1) a Motion for Summary Judgment filed by Defendant Livingston & Co., Inc. ("Livingston") (Doc. # 330); and (2) Certain Parties' Adoption of the Motion for Summary Judgment filed by Defendant Livingston & Co., Inc. (Doc. # 335).

In its Motion, Livingston argues that no genuine issue of material fact exists with respect to its potential liability for response costs in this litigation, which arises under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.* ("CERCLA"). Despite its admission that it contributed worn out lead-acid batteries to the United Scrap Lead Superfund site, where such batteries were discarded be-

Patrick Dennis Quinn, United States Attorney's Office, Dayton, OH, Matthew A. Fogelsonm, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, David F. Musel, United States Department of Justice Environment & Natural Resources Division, Environmental Enforcement Section, Washington, DC, Gregory L. Lattimer, Environmental Enforcement Section, Land and Natural

tween 1946 and 1983, Livingston insists that it cannot be held responsible for the Government's environmental clean-up costs.

The basis for Livingston's Motion is that it sold the old batteries to the United Scrap Lead Company ("USLC") with the intent of recycling the lead contained therein, not with the intent of disposing of any hazardous substances. Livingston also argues that its transactions with USLC involved the sale of a "useful product," namely batteries containing valuable lead. Consequently, Livingston argues that it did not "arrange for" the disposal of hazardous substances, within the meaning of CERCLA. Based upon that premise, Livingston contends that it is not responsible for the Plaintiff's costs in responding to the release of hazardous substances at the battery disposal site. (Motion for Summary Judgment, Doc. # 330).

In response, the United States and the United Scrap Lead Respondent Group ("Respondents") argue that Livingston did intend to enter into a transaction (the sale of "junk batteries") which included an "arrangement for" the treatment or disposal of hazardous substances. The Respondents insist that such intent is sufficient to establish Livingston's liability as a responsible party under CERCLA. The Respondents also assert that the sale of "junk batteries" does not constitute a transaction involving a "useful product" or raw materials. (Memorandum in Opposition to Summary Judgment, Doc. # 349). Consequently, they argue that CERCLA's "useful product" defense does not apply. In reply, Livingston contends that the Respondents have presented no evidence "tending to establish that [its] intent in selling the batteries was to arrange for the disposal of a hazardous product." (Reply Memorandum, Doc. # 373 at 1–2).

## I. Summary Judgment Standard

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judg-

ment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed. R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment

cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. Analysis of Livingston's Motion for Summary Judgment (Doc. # 330)

Resolution of Livingston's Motion turns upon the scope of "arranger liability" under CERCLA—an issue which is addressed in 42 U.S.C. § 9607(a)(3). That statutory provision states, in relevant part:

> (3) any person who by contract, agreement, or otherwise *arranged for disposal or treatment* ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, ... shall be liable ....

(Emphasis added).

Although CERCLA does not define the phrase "arranged for," the Sixth Circuit discussed its meaning, in the context of arranger liability, in *United States v. Cello Foil Products, Inc.*, 100 F.3d 1227 (6th Cir.1996). After setting forth the foregoing statutory provision, the Sixth Circuit

reasoned that the proper inquiry, with respect to arranger liability, "is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal [or treatment] of hazardous substances." The *Cello Foil* court also noted that "[t]he intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Id.* at 1231. Although CERCLA is a strict liability statute, the Sixth Circuit explained that courts must "recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal ... of hazardous substances.'" *Id.* Specifically, a "court must inquire into what transpired between the parties and what the parties had in mind with regard to disposition of the hazardous substance." *Id.* Such an inquiry "does not undermine the strict liability nature of CERCLA." *Id.* at 1232. This is so because "[t]he intent inquiry is geared only towards determining whether the party in question is a potentially liable party. Once a party is determined to have the requisite intent to be an arranger, then strict liability takes effect." *Id.* Therefore, "if an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances." *Id.* A "party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." *Id.*

Applying the foregoing standards, the *Cello Foil* court found a genuine issue of material fact as to whether the purchasers of drums containing solvent could face "arranger liability" under CERCLA, based upon their return of the reusable drums with small quantities of the solvent remaining therein. Following the return of the drums through a drum-deposit arrangement, the seller of the solvent had poured any remaining contents on the ground and refilled the drums for resale.

After discovering that the discarded solvent had contaminated the ground, the Government brought an action under CERCLA to recover response costs from several solvent purchasers who had returned drums. The Government alleged that the solvent purchasers had "arranged for" the disposal of hazardous substances (the residual quantities of solvent remaining in the drums) when they returned the drums to the seller. The district court rejected the Government's argument and entered summary judgment in favor of the defendant-purchasers, reasoning:

> [T]he court concludes, therefore, that Defendants are not liable under section 107(a)(3) absent a showing that they intended to dispose of the residual amounts of the hazardous substances remaining in their returned drums. It is immediately clear that the Government's claim against Defendants fails to establish liability. The *purpose* of Defendants returning of the drums was to recover the deposits that Defendants had paid; the Government has absolutely no proof that Defendants' purpose was to dispose of residual amounts of hazardous substances remaining in those drums. That Defendants incidentally got rid of these residues does not mean that it was Defendants' purposeful intent to dispose of the residues; rather, this was merely incidental to the drum return.

*Id.* at 1233.

Upon review, the Sixth Circuit reversed the district court's judgment, concluding that the lower court had "employed an overly restrictive view on what is necessary to prove intent, state of mind, or purpose, by assuming that intent could not be inferred from the indirect action of the parties." *Id.* While agreeing that the purchasers' primary purpose in returning the drums was to recover their deposits, the Sixth Circuit found a reasonable inference that a "further purpose was to dispose of the residual wastes returned with the

drums." *Id.* Specifically, the *Cello Foil* court noted that the purchasers arguably had taken affirmative steps to dispose of the solvent:

> "By leaving amounts of solvent in drums ranging from one-half to ten gallons, which Defendants knew [the seller] would carry away, a trier of fact could infer that Defendants were taking affirmative acts to dispose."

*Id.* at 1233.

In reaching this conclusion, the Sixth Circuit recognized that " '[f]requently, the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally, the actor is presumed to have intended the natural consequences of his deeds.' " *Id.*, quoting *Washington v. Davis*, 426 U.S. 229, 253, 96 S.Ct. 2040, 48 L.Ed.2d 597 (Stevens, J., concurring).

In the present case, Livingston acknowledges *Cello Foil* but argues that the record lacks "one shred" of evidence that it intended to enter into an arrangement for the disposal of hazardous waste. Rather, Livingston insists that its sole intent was to send batteries to the Superfund site for recycling of the lead contained therein. (Doc. # 330 at 11). In support, the company cites an affidavit from its Vice President, Roger Livingston, who avers in part:

> 5. I have first hand knowledge concerning sales to Bailen Brothers, also known to me as United Scrap Lead or United Scrap Lead Corporation (USLC).

> 6. USLC over the years approached our company seeking to purchase used lead batteries for its use.

> 7. It is my understanding that USLC was purchasing used lead batteries from us to recover and recycle the lead.

> 8. We did not give away the batteries, but rather we sold the batteries to USLC.

> 9. The sale price was agreed upon and USLC would pick up its purchased batteries and take them presumably to its facility in Troy, Ohio.

> 10. My intention and our company's intention was to sell these batteries to USLC for its recycling of the lead.

> 11. It was my understanding that the batteries USLC purchased were in a form useful to USLC.

> 12. It was never my intention to send the batteries to USLC to dispose of them.

> 13. I did not have any involvement, control, or influence over how USLC recycled the lead from the batteries it purchased from us.

(Doc. # 330 at Exh. 2).

In support of its Motion, Livingston also cites answers to requests for admissions provided by Charles Bailen, who worked for USLC from 1949 to 1980. Bailen has admitted that the price Livingston received for its batteries was based upon the price of new lead, as indicated in the Wall Street Journal. (*Id.* at Exh. 3). Livingston also stresses that USLC solicited its business and picked up the batteries for later processing at the Superfund site. (*Id.*). According to Livingston, the foregoing facts establish, as a matter of law, that it did not intend to arrange for the disposal of any hazardous waste.

■ In light of *Cello Foil* and other relevant case law, the Court finds Livingston's argument unpersuasive. Construing the evidence and all reasonable inferences in a light most favorable to the Respondents, the Court cannot say, as a matter of law, that Livingston lacked the intent to enter into a transaction that included an arrangement for the disposal or treatment of hazardous substances. *Cello Foil*, 100 F.3d at 1231. As the Sixth Circuit has recognized, such intent may be "inferred from the totality of the circumstances." *Id.*

Construed most strongly in the Respondents' favor, the record contains evidence

from which a trier of fact could infer that Livingston *did* intend to enter into such a transaction. Just as the purchasers in *Cello Foil* arguably intended to provided the seller with barrels for reuse *and* solvent for disposal, a trier of fact could infer that Livingston intended to provide USLC with lead for recycling *and* acid/lead-contaminated battery casings for disposal. Contrary to the assertion in Livingston's Motion for Summary Judgment, it did not sell lead in the form of a raw material. (Doc. # 330 at 4–5). Rather, it sold junk batteries[1] that had to be "cracked" in order for the scrap lead to be extracted from the worthless acid and battery casings, which USLC discarded on its property. Charles Bailen, an operator of the United Scrap Lead site, has testified that battery-breaking involved cutting off battery tops, draining the acid into a pit and grinding the contaminated casings for disposal at the Superfund site. (Bailen depo. of August 7, 1995, at 58–75). This process of extracting lead from spent batteries and discarding the unwanted acid and casings has been characterized as the "disposal" of a hazardous substance under CERCLA. *See Catellus Development Corp. v. United States*, 34 F.3d 748, 753 (9th Cir.1994) ("An inescapable fact is that the leftover battery casings must be disposed of. The battery casings ... unlike the lead plates within the casings, were not the subject of recycling. They retained their character as waste throughout and would have to be 'gotten rid of,' either by General, which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by Kirk after it bought the entire battery. General cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings."); *see also Douglas County, Nebraska v. Gould, Inc.*, 871 F.Supp. 1242, 1247 (D.Neb.1994) ("In selling whole spent batteries, the seller is merely getting rid of a product which has no use except to reclaim the lead inside.... In such a case, the sale is actually a disposal.").

In the present case, Livingston admits knowing that USLC purchased used lead batteries to recover and recycle the lead contained therein. (Doc. # 330 at Exh. 2). Given that such recovery requires "battery-breaking," a process which inevitably involves the disposal of the unwanted hazardous materials, a trier of fact reasonably could infer that Livingston *intended* to "arrange for" the disposal of a hazardous substance (battery acid and contaminated casings) when it sold whole batteries to USLC. By providing USLC with recyclable lead enclosed in worthless acid and contaminated casings, a reasonable inference exists that Livingston intended to recycle the lead *and* to dispose of the acid and casings. As noted above, a party cannot escape "arranger liability" by selling a whole battery to a third party, which then is required to crack the battery and dispose of the worthless remnants.[2] Consequently, the Court cannot conclude, as a

---

1. Although Livingston objects to the phrase "junk batteries" (because they contained salable lead), the batteries at issue were "junk" in the sense that they could not be used *as batteries*. *See* August, 1995, Depo. of C. Bailen (explaining that the batteries purchased by USLC had "no more use for what [they were] originally intended to be used for, which would be starting an automobile...."). Consequently, the phrase "junk batteries" is not inaccurate.

2. In opposition to this conclusion, Livingston contends that it had no knowledge of the "process" employed by USLC when it removed the lead from the junk batteries. Livingston also argues that it did not intend for USLC to engage in a process that would involve the release of contaminants.(Doc. # 373 at 8–9). These arguments do not establish Livingston's entitlement to summary judgment. Charles Bailen has testified that USLC's customers "knew what we were going to do, we were going to take the lead out and ship it to lead smelters." (August 8, 1999, Bailen Depo. at 368) (Emphasis added). Although Livingston may not have known the exact "cracking" procedure employed by USLC, it knew that the company would be left with battery acid and a battery case after the valuable lead was extracted and sold. A trier of fact certainly could find such knowledge on the part of Livingston, given that it sold the lead, not as a raw material, but encased in a

matter of law, that Livingston lacked the intent to enter into a transaction that included an arrangement for the disposal of hazardous substances when it sold whole, spent batteries to USLC.[3]

Roger Livingston's averments to the contrary do not compel a different conclusion. As the Sixth Circuit recognized in *Cello Foil*, the most probative evidence of intent is often " 'evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.' " *Cello–Foil*, 100 F.3d at 1233. Herein, Livingston's sale of whole, junk batteries to USLC is probative evidence that it engaged in an "affirmative act to dispose" of the useless battery acid and contaminated casings. *Id.* at 1232.[4]

Additionally, the Court cannot say, as a matter of law, that Livingston did not intend to "arrange for" the "treatment" of hazardous substances when it sold spent batteries to USLC. As noted above, Liv- ingston admits knowing that USLC planned to extract the scrap lead from the batteries, a process which has been recognized as "treatment" under CERCLA. *See Catellus*, 34 F.3d at 753 ("[W]hen General sold the batteries to Kirk there was an arrangement for treatment created.... [The sale] was in order that Kirk would treat the batteries by making the lead in the batteries 'amenable for recovery.' The processing by Kirk would also have the effect of 'reduc[ing] in volume' the battery material that would have to be discarded.")[5]; *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1141 (N.D.Fla.1994) ("The process of breaking open the batteries, recovering the lead groups, washing the lead, and disposing of the acid and battery casings amounted to 'treatment' of a hazardous substance as defined by CERCLA.").

■ Finally, the Court finds no merit in Livingston's argument that it cannot be

---

worthless, contaminated battery shell. As in *Catellus, supra,* "it was inevitable that at the end there would be lead-containing, hence contaminating, battery casings to discard." *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 385 (7th Cir.1995). Furthermore, it is irrelevant that Livingston did not intend for USLC to engage in the "release of contaminants." (Doc. # 373 at 9). "If an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances.... Therefore, once it has been established that a party possessed the requisite intent to be an arranger, the party cannot escape liability by claiming that it had no intent to have the waste disposed of in a particular manner or at a particular site." *Cello–Foil,* 100 F.3d at 1232.

3. In its Motion for Summary Judgment, Livingston insists that it intended only to recycle scrap lead. As the *Catellus* court properly noted, however, a supplier such as Livingston could have cracked the batteries itself and sold only the lead plates. If it had done so, the Court might agree that its transactions with USLC were conducted for the sole purpose of recycling. Livingston's decision to sell whole batteries, however, supports a rea- sonable inference that it intended to enter into a transaction for the disposal of hazardous substances.

4. In *Cello Foil,* the Sixth Circuit reasoned that "by leaving amounts of solvent in drums ranging from one-half to ten gallons, which Defendants knew Thomas Solvent would carry away, a trier of fact could infer that Defendants were taking affirmative acts to dispose." *Cello–Foil,* 100 F.3d at 1233. Similarly, by leaving scrap lead encased in worthless hazardous materials, which Livingston knew that USLC would carry away, a trier of fact could infer that Livingston took affirmative acts to dispose.

5. " 'Disposal' and 'treatment' are defined in CERCLA, 42 U.S.C. § 9601(29), by reference to the definitions of those terms in section 1004 of the Solid Waste Disposal Act (SWDA), 42 U.S.C. § 6903." *Catellus,* 34 F.3d at 750. The SWDA defines "treatment" as, among other things, "rendering waste 'amenable for recovery, ... or reduced in volume.' " 42 U.S.C. § 6903(34). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment ...." 42 U.S.C. § 6903(3).

liable under CERCLA because it sold a "useful product" for a useful purpose. (Doc. # 330 at 12). The Sixth Circuit addressed the so-called "useful product" defense in *Cello Foil*, 100 F.3d at 1232. In so doing, the *Cello Foil* court recognized that CERCLA liability will not flow from "the sale of a useful hazardous substance *for its original intended purpose.*" *Id.* at 1232 n. 1 (Emphasis added). The *Cello Foil* court then reasoned that the return of reusable drums containing solvent was not a conveyance of a useful item for a useful purpose. *Id.* In reaching this conclusion, the court noted that "this case is not about the disposal of the drums, it is about the disposal of their contents." *Id.* Similarly, the present case is not about the disposal of the scrap lead (which, like the drums in *Cello Foil,* had a useful purpose). Rather, the present case is about the disposal of the remaining acid and battery casings (which did not have a useful purpose). In any event, Livingston's "useful product" argument is unavailing, because its sale of batteries to USLC did not involve the sale of an item "for its original intended purpose." *Id.* The spent batteries purchased by USLC were useless *as batteries.* The sale of junk batteries is not the sale of a "useful product." *See, e.g., Chatham,* 858 F.Supp. at 1140; *Gould, Inc. v. A & M Battery and Tire Service,* 933 F.Supp. 431, 436 (M.D.Pa.1996).

In opposition to the foregoing conclusion, Livingston fails to address the Sixth Circuit's reasoning in *Cello Foil.* Rather, it relies upon a Fourth Circuit decision, *Pneumo Abex Corp. v. High Point Thomasville & Denton Railroad Co.,* 142 F.3d 769, 772 (4th Cir.1998). (Doc. # 330 at 12–14). Upon review, the Court finds *Pneumo* distinguishable. In *Pneumo,* the Fourth Circuit found no arrangement for the treatment of hazardous substances, based upon a railroad's sale of broken or worn out wheel bearings to a foundry. After receiving the old bearings, the foundry melted them and created new bearings. The melting process caused various impurities ("slag and dust") to float to the top, where they were skimmed and then dumped on the foundry's property. After conducting a fact-specific inquiry, the Fourth Circuit determined that the sale of the old bearings was more akin to the sale of a useful product than to a transaction for disposal of hazardous substances. *Id.* at 775.

In reaching its conclusion, the *Pneumo* court noted that slag and dust would have been produced during the melting process even if the railroad had sold the foundry virgin materials. *Id.* The court also stressed that "the removal of contaminants was not the purpose of the transaction . . . ." Rather, "[t]he removal of the dirt and grease was incidental to remolding new bearings, just as it would have been incidental to the molding of new bearings from virgin materials." *Id.* The *Pneumo* court also noted that "[t]he intent of both parties to the transaction was that the wheel bearings would be reused in their entirety in the creation of new wheel bearings." *Pneumo Abex,* 142 F.3d at 775.

Significantly, none of the foregoing factors support Livingston's position in the present case. *First,* if Livingston had provided USLC with virgin lead in the form of a raw material, as opposed to scrap lead in a spent battery, the site contamination would not have occurred. *Second,* the removal of battery acid and the battery casing was not "incidental" to the transaction at issue. Rather, the separation of the scrap lead from the other materials for recycling was, at least arguably, the *purpose* of the transaction. *Third,* the intent of the parties *was not* that the spent batteries would be reused in their entirety. Rather, Livingston understood that USLC "was purchasing used lead batteries *to recover* and recycle *the lead.*" (Doc. # 330, Livingston affidavit at ¶ 7); *see also* Bailen depo. at 368 (noting that USLC customers "knew what we were going to do, we were going to take the lead out and ship it to lead smelters"). For the foregoing reasons, the Court finds the present case sufficiently distinguishable from *Pneumo,* insofar as the Fourth Circuit's ruling is pertinent to the analysis set forth herein.

Construing the evidence and all reasonable inferences in a light most favorable to the Plaintiff, a trier of fact reasonably could infer that Livingston intended to enter into a transaction with USLC which included an arrangement for the disposal or treatment of hazardous substances, namely battery acid and contaminated battery casings, in violation of CERCLA.[6] Accordingly, Livingston's Motion for Summary Judgment (Doc. # 330) is hereby overruled.

### III. Certain Parties' Adoption of Livingston & Co., Inc.'s Motion for Summary Judgment (Doc. # 335)

In a document captioned "Certain Parties' Adoption of Livingston & Co., Inc.'s Motion for Summary Judgment and Memorandum in Support" (Doc. # 335), several Defendants seek summary judgment, based upon the reasoning set forth in Livingston's Motion for Summary Judgment (Doc. # 330). Those Defendants include Ace Iron and Metal Co., Inc., Barker Junk Company, Inc., Caldwell Iron & Metal, Decatur Salvage, Inc., Mid–Ohio Battery, Inc. and Xenia Iron & Metal, Inc. (Doc. # 335 at 1). Upon review, the Court finds Certain Parties' Motion unpersuasive. The Court has overruled Livingston's Motion for Summary Judgment, and Certain Parties merely adopt, by reference, the arguments contained therein. Accordingly, for the reasons set forth more fully above, Certain Parties' Motion (Doc. # 335) is hereby overruled.

6. In a concluding section of its Motion for Summary Judgment, Livingston argues briefly that imposing CERCLA liability in the present case will send an anti-recycling message and unjustly punish it for reducing reliance on natural resources and landfills. (Doc. # 330 at 15). Although the Court recognizes that CERCLA can be a harsh statute, Livingston's potential liability does not flow its laudable desire to recycle lead. If Livingston had re-moved the lead from its batteries, it could have recycled that lead without incurring potential CERCLA liability, provided that it disposed of the acid and battery casings in an environmentally responsible manner By selling whole, spent batteries to a battery-breaking operation, however, Livingston risked incurring CERCLA liability if its batteries were not disposed of properly.