UNITED STATES of America,
Plaintiff,

v.

The ATLAS LEDERER COMPANY,
et al., Defendants.

No. C-3-91-309.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 22, 2000.

Patrick Dennis Quinn, U.S. Attorney's Office, Dayton, OH, Matthew A. Fogelsonm, Gregory L. Sukys, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, David F. Musel, U.S. Dept. of Justice & Natural Resources Division, Environmental Enforcement Section, Washington, DC, Gregory L. Lattimer, Environmental Enforcement Section, Land and Natural Resources Division, U.S. Dept. of Justice, Washington, DC, David A. Carson, U.S. Dept. of Justice, Environment and Natural Resources Div., Environmental Defense Section, Washington, DC, Cecilia E. Kim, Environmental Defense Section, Environment and Natural Resources Div., U.S. Dept. of Justice,

Washington, DC, Thomas Giller, U.S. Dept. of Justice, Chicago, IL, Sherry L. Estes, Asst. Regional Counsel, U.S. Environmental Protection Agency, Chicago, IL, Jacqueline Schuster Hobbs, Benesch, Friedlander Coplan & Aronoff, Cincinnati, OH, for plaintiff.

Michael A. Cyphert, Heather A. Austin, Louis L. McMahon, Cleveland, OH, for defendants.

DECISION AND ENTRY OVERRULING MOTION FOR SUMMARY JUDGMENT (DOC. #328) FILED BY DEFENDANT BROADWAY IRON AND METAL, INC.

RICE, Chief Judge.

This matter comes before the Court upon a Motion for Summary Judgment (Doc. # 328) filed by Defendant Broadway Iron and Metal, Inc. ("Broadway"). In its Motion, Broadway argues that no genuine issue of material fact exists with respect to its potential liability for response costs in this litigation, which arises under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.* ("CERCLA").

The basis for Broadway's Motion is that it cannot be held responsible for the costs incurred by the Government in cleaning up hazardous substances at the United Scrap Lead Superfund site, where spent lead-acid batteries were discarded between 1946 and 1983. Specifically, Broadway contends that it is not a "responsible person" under CERCLA, because it never conducted any business with an entity known as the United Scrap Lead Company ("USLC"), which operated the site. Broadway also insists that the record is devoid of evidence from which a trier of fact could conclude that it sold spent batteries to another entity, State Iron Company ("State Iron"), which in turn sold the batteries to USLC. Finally, Broadway argues that it cannot be responsible for response costs under CERCLA, assuming, arguendo, that it did sell batteries to State

Iron, which in turn sold them to USLC. In opposition to Broadway's Motion, the United States and the United Scrap Lead Respondent Group ("Respondents") insist that a trier of fact could find: (1) that USLC purchased junk batteries from Broadway for disposal at the Superfund site; and (2) that Broadway sold junk batteries to State Iron, which then sold them to USLC for disposal at the site.

I. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 [6th Cir.1987]). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evi-

dence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Analysis of Broadway's Motion for Summary Judgment (Doc. # 328)*

As set forth above, Broadway advances three arguments in its Motion for Summary Judgment. *First,* it contends that the record contains insufficient evidence for a trier of fact to conclude that it sold junk batteries to USLC. *Second,* it argues that the record contains insufficient evi-

dence to support a finding that it sold batteries to State Iron, which in turn sold them to USLC. *Third,* Broadway insists that it cannot be liable under CERCLA, even assuming, arguendo, that it did sell spent batteries to State Iron. Upon review, the Court concludes that Broadway has failed to demonstrate its entitlement to judgment as a matter of law on any of these issues. Construing the facts and all reasonable inferences in a light most favorable to the Respondents, the Court finds evidence from which a trier of fact could conclude that Broadway intentionally "arranged for" the disposal of hazardous substances, either by: (1) selling spent batteries to USLC directly; or (2) by selling the batteries to State Iron, which then sold them to USLC. Additionally, construed most strongly in the Respondents' favor, the record contains evidence from which a trier of fact reasonably could impose CERCLA liability on Broadway, based upon its sale of spent batteries to State Iron. As a means of analysis, the Court will address Broadway's three arguments seriatim.

### A. *Broadway's Sale of Batteries to USLC*

In support of its argument that it never transacted any business directly with USLC, Broadway relies in part upon an affidavit from its President, Jerry Sacco. In relevant part, Sacco avers:

4. The records of Broadway Iron indicate that Broadway Iron never had any dealings with United Scrap Lead. Affiant's personal recollection is that Broadway Iron has never had any dealings with United Scrap Lead.

5. The records of Broadway Iron indicate that Broadway Iron has never entered into any agreements or contracts with United Scrap Lead to transport, dispose or treat hazardous substances. Affiant's personal recollection is that Broadway Iron has never entered into any agreements or contracts with

United Scrap Lead to transport, dispose or treat hazardous substances.

(Sacco affidavit, Doc. # 328 at Exh. A).

Broadway also relies upon testimony from USLC operator Charles Bailen, who stated in a January 22, 1999, deposition that he could not recall anyone from Broadway ever visiting the USLC Superfund site. (Bailen depo. of Jan. 22, 1999, at 52). During that deposition, Bailen explained that he "thinks" Broadway sold its batteries to State Iron, which then sold the batteries to USLC. (*Id.* at 50–51). He also explained that USLC then would have picked the batteries up at Broadway's place of business, rather than having State Iron pick them up. (*Id.* at 51). According to Bailen, State Iron's role in the transactions was that of a broker. (*Id.*). Based upon the foregoing testimony, Broadway contends that no trier of fact could find that it sold batteries directly to USLC.

In opposition to Broadway's Motion for Summary Judgment, the Respondents also cite testimony from Charles Bailen. Specifically, they rely upon his prior September 26, 1996, deposition testimony. During that testimony, Bailen stated that USLC had purchased batteries from everyone identified on a particular customer price list—a list which includes Broadway's name. (Bailen depo. of Sept. 26, 1996, at 19). Additionally, Bailen testified in his 1996 deposition that he specifically recalled purchasing "scrap batteries" from Broadway. (*Id.* at 24–25). Finally, attached to the Respondents' Memorandum opposing summary judgment is a May 22, 1999, affidavit, in which Bailen reiterates that "[t]he companies listed on United Scrap Lead Customer Price List (Tab 1) represent customers who sold used batteries to United Scrap Lead at one time or another." (Bailen affidavit, Doc. # 348 at Exh. B, ¶ 5). Based upon this evidence, the Respondents argue that, at a minimum, a genuine issue of material fact exists regarding Broadway's sale of batteries to USLC.

In a Reply Memorandum, Broadway urges the Court not to consider Bailen's May 22, 1999, affidavit, because it contradicts his January 22, 1999, deposition testimony, in which he could not recall dealing directly with Broadway. Absent that affidavit, Broadway insists that the record contains insufficient evidence to support a finding that it was a customer of USLC. In support of this contention, Broadway stresses: (1) the absence of documents showing that any of its batteries ever ended up at USLC; and (2) the affidavit of its President, Jerry Sacco, who denies ever dealing with USLC.

■ Upon review, the Court finds Broadway's argument unpersuasive. The Court does not dispute that a party may not create a genuine issue of material fact by contradicting deposition testimony with a more recent affidavit. In *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984), the Sixth Circuit recognized that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." As a result, a party *cannot* create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been filed, that contradicts his earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986).

■ In the present case, however, the Court finds a genuine issue of material fact regarding Broadway's dealings with USLC, without respect to Bailen's May 22, 1999, affidavit. In his 1996 deposition testimony, Bailen stated that everyone on his customer price list had sold batteries to USLC. (Bailen depo. of Sept. 26, 1996, at

19). He recalled purchasing "scrap batteries" from Broadway. (*Id.* at 24–25). Construed most strongly in the Respondents' favor, this testimony is sufficient to raise a genuine issue of material fact as to whether Broadway ever dealt directly with USLC.

Without question, Bailen's subsequent January 22, 1999, deposition testimony is inconsistent with his September 26, 1996, testimony. In his 1999 testimony, Bailen failed to recall dealing directly with Broadway. This inconsistency does not mean, however, that Broadway is entitled to judgment as a matter of law. Rather, it simply creates a genuine issue of material fact for the trier of fact to resolve. Bailen's deposition testimony presents a situation quite unlike the traditional scenario, in which a party first makes a damaging statement in a deposition and later tries to undo the harm by submitting a contradictory affidavit. Herein, Bailen's initial deposition testimony was favorable to the Respondents. To the extent that his 1999 testimony contradicts his former testimony, that contradiction favors Broadway, not the Respondents. In light of the traditional role played by the trier of fact in resolving conflicting evidence and questions of credibility, the Court concludes that the inconsistency in Bailen's testimony cannot be resolved in the context of summary judgment. A trier of fact might conclude that Bailen's former testimony is more credible, and that his recollection was better in 1996 than it was in 1999.[1] Conversely, a trier of fact might find that Bailen was inaccurate in 1996, and that his 1999 testimony represents the true state of events. Finally, a trier of fact also could conclude that Broadway was a direct customer of USLC, based upon Bailen's testimony that everyone on the customer price list sold batteries to his company.[2]

---

1. Indeed, after refreshing his recollection with a copy of his 1996 deposition, if necessary, Bailen might testify at trial that he *does* recall dealing directly with Broadway. In his 1999 deposition, Bailen was not given the opportunity to refresh his recollection after failing to recall any direct dealings with Broadway. It may or may not be that he would have answered differently if he had been given that opportunity.

2. Shortly after making this statement during his 1996 deposition, Bailen qualified his testi-

### B. Broadway's Sale of Batteries to State Iron and Subsequent Sale to USLC

Broadway next argues that the record contains insufficient evidence from which a trier of fact could find that it sold batteries to State Iron, which then sold them to USLC. In support, Broadway relies, once again, upon an affidavit from its President, Jerry Sacco, who avers in relevant part:

6. The records of Broadway Iron indicate that Broadway Iron has never entered into any agreement or contract with a broker or third party to transport, remove, store or dispose of lead materials. Affiant's personal recollection is that Broadway Iron has never entered into any agreements or contracts with a broker or third party to transport, remove, store or dispose of lead materials.

7. The records of Broadway Iron indicate that Broadway Iron never entered into any agreements or contracts with a company called State Iron in which State Iron purchased lead batteries from Broadway Iron. Affiant's personal recollection is that Broadway Iron never entered into any contract or agreement with State Iron in which State Iron purchased lead batteries owned by Broadway Iron.

(Sacco affidavit, Doc. # 328 at Exh. A).

Broadway also asserts that Bailen's deposition testimony does not create a genuine issue of material fact with respect to its alleged sale of batteries to State Iron. In particular, Broadway notes that Bailen did not testify, with certainty, that it sold batteries to State Iron, which in turn sold the batteries to USLC. Rather, Bailen testified that he thought such transactions had taken place. According to Broadway, this "qualification" of Bailen's testimony pre-vents it "from being conclusive on the factual issue of whether Broadway Iron sold lead batteries to State Iron and whether those batteries were ultimately sent to the [Superfund] [s]ite." (Doc. # 328 at 5).

■ The Court finds Broadway's argument unpersuasive. In light of Sacco's affidavit, Bailen's testimony may be insufficient to demonstrate that the Respondents are entitled to judgment as a matter of law. Nevertheless, the testimony is sufficient to create a genuine issue of material fact as to whether Broadway sold batteries to State Iron, which sold them to USLC. After reviewing a USLC price list containing the name "Broadway Iron & Metal Co." and the notation "for State," Bailen explained:

"It was probably State [Iron] calling us to pick up[.] State [Iron] bought the batteries from Broadway Iron & Metal Company and then they sold [them] to us.... State would have called us and told us they have this dealer, Broadway Iron & Metal, who has X number of batteries[.] State bought [them], and rather than State pick[ing] [them] up and our going and picking [them] up from State ... we just picked [them] up directly. State was the broker."

(Bailen depo. of Jan. 22, 1999, at 50–51).

Construing the foregoing testimony in a light most favorable to the Respondents, a trier of fact could find that Broadway sold junk batteries to State Iron, which sold them to USLC. Bailen's testimony that he "think[s]" USLC dealt with State Iron does not compel the entry of summary judgment in favor of Broadway. (Id. at 50). To the contrary, Bailen's testimony is merely another way of saying that the existence of such a relationship is more probable than not.[3] Otherwise, Bailen

---

mony by noting that "there may be a few" companies on the list which did not sell USLC any batteries. (Bailen depo. of Sept. 26, 1996, at 20). In any event, a trier of fact could conclude from his testimony that *most* of the companies on the list sold batteries to USLC. Therefore, it would be more likely than not that Broadway did so, given that its name is on the list. See, e.g., Bailen depo. of Jan. 22, 1999 (stating that "chances are" any company identified on the price list sold batteries to USLC).

**3.** During his deposition, Bailen was not asked to quantify his degree of certainty. Thus,

would have testified that he *does not* "think" such a relationship existed. Any uncertainty in Bailen's testimony may affect the weight ultimately assigned to it by a trier of fact. Construed most strongly in the Respondents' favor, however, his testimony is sufficient to create a genuine issue of material fact for trial.

## C. Broadway's CERCLA Liability Based Upon Sales to State Iron

In a final argument, Broadway contends that it cannot be liable under CERCLA, as a matter of law, even if it did sell junk batteries to State Iron, which then sold the batteries to USLC. Resolution of this argument turns upon the proper scope of "arranger liability" under CERCLA, an issue which is addressed in 42 U.S.C. § 9607(a)(3). That statutory provision states, in relevant part:

> (3) any person who by contract, agreement, or otherwise *arranged for disposal* or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, ... shall be liable....

(Emphasis added).

Although CERCLA does not define the phrase "arranged for," the Sixth Circuit discussed its meaning, in the context of arranger liability, in *United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227 (6th Cir.1996). After setting forth the foregoing statutory provision, the Sixth Circuit reasoned that the proper inquiry, with respect to arranger liability, "is whether the party intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances." The *Cello-Foil* court also noted that "[t]he intent need not be proven by direct evidence, but can be inferred from the totality of the

circumstances." *Id.* at 1231. Although CERCLA is a strict liability statute, the Sixth Circuit explained that courts must "recognize the indispensable role that state of mind must play in determining whether a party has 'otherwise arranged for disposal ... of hazardous substances.'" *Id.* A "court must inquire into what transpired between the parties and what the parties had in mind with regard to disposition of the hazardous substance." *Id.* Such an inquiry "does not undermine the strict liability nature of CERCLA." *Id.* at 1232. This is so because "[t]he intent inquiry is geared only towards determining whether the party in question is a potentially liable party. Once a party is determined to have the requisite intent to be an arranger, then strict liability takes effect." *Id.* Therefore, "if an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances." *Id.* A "party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." *Id.*

Applying the foregoing standards, a trier of fact could find that Broadway intentionally entered into transactions with State Iron which included "arrangements for" the disposal of spent batteries. As set forth above, USLC operator Charles Bailen has testified that Broadway sold batteries to State Iron, which acted as a broker and sold the batteries to USLC. (Bailen depo. of Jan. 22, 1999, at 51). Bailen explained the transactions as follows:

> It was probably State [Iron] calling us to pick up[.] State [Iron] bought the batteries from Broadway Iron & Metal Company and then they sold [them] to us.... State would have called us and

Bailen may be ninety-nine percent sure that he dealt with State Iron by picking up spent batteries that it had purchased from Broadway, or his level of certainty may be far less.

In any event, Bailen's failure to testify in terms of absolute certitude does not entitle Broadway to summary judgment.

told us they have this dealer, Broadway Iron & Metal, who has X number of batteries[.] State bought [them], and rather than State pick[ing] [them] up and our going and picking [them] up from State ... we just picked [them] up directly. State was the broker.

(*Id.* at 50–51).

Construing Bailen's deposition testimony in a light most favorable to the Respondents, a trier of fact could conclude that Broadway intentionally arranged for the disposal of a hazardous substance (spent batteries), in violation of CERCLA. By providing State Iron, a scrap metal dealer, with junk batteries which it knew that USLC, a "battery-breaker," would pick up at its location and haul away, Broadway at least arguably engaged in an "affirmative act" to dispose of hazardous waste. *Cello–Foil*, 100 F.3d at 1234.

■ In opposition to this conclusion, Broadway insists that an "upstream generator" of hazardous waste cannot be liable for response costs under CERCLA, based upon "being at the front end of a chain of transactions which result in the release of hazardous substances." (Doc. # 370 at 6). Upon review, the Court finds Broadway's argument unpersuasive. The weight of legal authority holds that when a sale of junk batteries is conducted through a broker or middleman, "the indirect seller is still liable." *Gould, Inc. v. A & M Battery and Tire Service*, 954 F.Supp. 1014, 1018 (M.D.Pa.1997). *See, e.g., Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1144 (N.D.Fla.1994) ("Although Mambourg disclaims any knowledge Sapp was involved in the transaction, it is undisputed Sapp picked up the batteries in trucks marked with the company's name.... [P]arties cannot escape liability under CERCLA merely because they pawned their hazardous substances off on a broker or middleman. As noted earlier, persons who generate hazardous substances or arrange for their disposal should not be allowed to

shirk their duties under CERCLA by operating blindfolded. Thus, the Court concludes that defendants who sold batteries to Sapp through a broker cannot escape liability merely because it was the middleman who decided to sell the batteries to Sapp."); *Chesapeake and Potomac Telephone v. Peck Iron & Metal Co.*, 814 F.Supp. 1293, 1299–1301 (E.D.Va.1993) (reasoning that junk battery sellers who knew that a battery-disposal site operator was picking up their batteries could be liable under CERCLA, despite the fact that they sold the batteries to a middleman, who in turn sold them to the site operator); *Gould v. A & M Battery & Tire Service*, 933 F.Supp. 431, 437 (M.D.Pa. 1996) (reasoning that the sale of batteries to broker who sells them to a recycling facility does not preclude "arranger" liability under CERCLA, when the sellers knew the destination of the batteries); *see also Acme Printing Ink Co. v. Menard, Inc.*, 881 F.Supp. 1237, 1249–1250 (E.D.Wis. 1995) (finding potential CERCLA liability even though objecting parties did not directly dispose of waste, but instead turned it over to another company, which then disposed of it).

The foregoing case law does not violate the parameters for "arranger liability" set by the Sixth Circuit in *Cello–Foil*. Although that case did not involve the use of a broker or middleman, the *Cello–Foil* court recognized that a "party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site." The critical inquiry is simply whether the seller "intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances." *Cello–Foil*, 100 F.3d at 1232.

In the present case, a trier of fact reasonably could find such intent based upon: (1) Broadway's decision to sell whole, spent batteries to State Iron, a scrap metal dealer [4]; and (2) the fact that, after the

4. The Court might reach a different conclu-

sion if Broadway had removed the lead from

sale, representatives of USLC, a "battery breaker" which operated the Superfund site at issue, traveled to Broadway's place of business to pick up the batteries.[5] Construed most strongly in favor of the Respondents, this evidence supports a reasonable inference that Broadway "arranged for" the disposal of hazardous waste.[6] Accordingly, Broadway has not demonstrated its entitlement to summary judgment.

### III. *Conclusion*

Based upon the reasoning and citation to authority set forth above, Broadway's Motion for Summary Judgment (Doc. # 328) is hereby overruled.

its batteries and sold only the lead to State Iron for recycling. Because it sold whole, spent batteries to a scrap-metal operation, however, a trier of fact could conclude that Broadway intended to enter into a transaction that included the recycling of the lead and the disposal of the hazardous acid and contaminated battery casings. *Cf. Catellus Development Corp. v. United States*, 34 F.3d 748, 753 (9th Cir.1994) ("An inescapable fact is that the leftover battery casings must be disposed of. The battery casings ... unlike the lead plates within the casings, were not the subject of recycling. They retained their character as waste throughout and would have to be 'gotten rid of,' either by General, which could have cracked the batteries itself before selling the scrap lead, or as was the case here, by Kirk after it bought the entire battery. General cannot escape having the battery casings defined as a discarded material simply by selling the battery to another party who then disposes of the casings."); *see also Douglas County, Nebraska v. Gould, Inc.*, 871 F.Supp. 1242, 1247 (D.Neb.1994) ("In selling whole spent batteries, the seller is merely getting rid of a product which has no use except to reclaim the lead inside.... In such a case, the sale is actually a disposal").

5. In reaching this conclusion, the Court finds unpersuasive Broadway's assertion that the Respondents "have not produced any evidence" to suggest that it knew the destination of the junk batteries. Based upon Bailen's testimony that USLC picked up the batteries at Broadway's place of business, a trier of fact could infer that Broadway knew the batteries were going to USLC and not to State Iron.

6. Parenthetically, the Court notes that a different result might be reached under a recent amendment to CERCLA, the Superfund Recycling Equity Act, P.L. 106–113. This new legislation exempts from liability many persons who arrange for the recycling of certain materials, including spent batteries. The Act was signed into law by President Clinton on November 29, 1999, but it has no applicability to the present litigation. Section 127(i) of the Superfund Recycling Equity Act specifically provides that it does not affect any pending judicial action initiated by the United States prior to its enactment. In light of that language, the Court finds the Act inapplicable to the present action, which the United States commenced approximately eight years before its enactment.